IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:13-CV-243-FL

| | |
|---|---|
| THOMAS EDWARD RIZOR, JR., )<br>        Plaintiff, )<br>)<br>)<br>        v. )<br>)<br>CAROLYN W. COLVIN, )<br>  Acting Commissioner of Social Security, )<br>)<br>        Defendant. ) | **MEMORANDUM AND<br>RECOMMENDATION** |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-22, DE-26] pursuant to Fed. R. Civ. P. 12(c). Plaintiff Thomas Edward Rizor, Jr. ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings and remanding this matter to the Commissioner for further proceedings.

**STATEMENT OF THE CASE**

Claimant protectively filed an application for a period of disability and DIB on May 11, 2012, alleging disability beginning April 22, 2012. (R. 11, 143.) His claim was denied initially and upon reconsideration. (R. 62, 77-78.) A hearing before Administrative Law Judge McArthur Allen ("the ALJ") was held on June 12, 2013, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 31-49.) On July 7, 2013, the

ALJ issued a decision denying Claimant's request for benefits. (R. 8-30.) On October 10, 2013, the Appeals Council denied Claimant's request for review. (R. 1-5.) Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision denying disability benefits under the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, ("Act") is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; [i]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks and citation omitted) (alteration in original). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589) (internal quotation marks omitted) (first and second alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court determines whether the Commissioner has considered all relevant evidence and sufficiently explained the weight accorded to the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

In making a disability determination, the Commissioner utilizes a five-step evaluation process. The Commissioner asks, sequentially, whether the claimant: (1) is engaged in

substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1; (4) can perform the requirements of past work; and, if not, (5) based on the claimant's age, work experience and residual functional capacity can adjust to other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id*. § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id*. § 404.1520a(e)(3).

In this case, Claimant alleges the following: (1) that the ALJ erred in determining that Claimant's mental impairments failed to meet or medically equal Listings 12.04 and 12.06 (Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") at 11-15); and (2) that the ALJ improperly assessed Claimant's RFC (Pl.'s Mem. at 15-17).

# FACTUAL HISTORY

## I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found that Claimant was no longer engaged in substantial gainful employment. (R. 13.) Next, the ALJ determined that Claimant suffered from the following severe impairments: oro-mandibular dystonia, post-traumatic stress disorder ("PTSD"), and depression. (R. 13-14.) The ALJ also concluded that Claimant suffered from the non-severe impairment of possible dissociative episodes/absence seizures. (*Id*.) At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-15.) Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in his activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace, and no episodes of decompensation of extended duration. (R. 15.)

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work with the following additional limitations:

> The claimant must avoid hazardous machinery and is limited to work requiring only simple, routine, repetitive tasks. He can have only occasional contact with co-workers and the general public, and is limited to only occasional communication with the public by way of telephone, radio, or other electronic devices.

(R. 16.) In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 17-23.) At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of past relevant work as a customer service representative and help desk representative. (R. 23.) Nonetheless, at step five, upon considering Claimant's age, education,

work experience and RFC, the ALJ determined that Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the local and national economies. (R. 24.)

## II. Claimant's Testimony

At the time of Claimant's administrative hearing, Claimant was thirty-six years old and unemployed. (R. 35.) Claimant graduated from high school and completed some college work and basic law enforcement training. (R. 35-36.) Claimant was last employed as a technical support representative for approximately nine months with DirecTV, where his duties included speaking with customers on the phone and helping them set up service. (R. 36, 189, 190, 227.) Claimant quit his job because he was unable to communicate effectively with customers due to jaw pain that made him unintelligible over the phone. (R. 36.) Claimant's past work experience also includes other customer service work and positions as a network engineer. (R. 36-37, 189, 227.)

Claimant identified numerous medical conditions in support of his disability claim and inability to work full-time. These medical conditions include depression, PTSD, and oro-mandibular dystonia.

Claimant testified that he is unable to work due to jaw pain caused by oro-mandibular dystonia. Claimant testified that the reason he left his last job as a customer service representative was because the pain in his jaw limited movement and made his speech difficult for customers to understand. (R. 36.) At times, the pain becomes so intense that Claimant is unable to move his jaw, rendering him unable to speak at all. (R. 41.) Claimant noted that he lost more than forty-five pounds over the previous two years because he cannot eat solid food. (R. 39, 41.) Claimant also stated that the muscle spasms in his jaw have been so severe that his teeth have chipped. (R. 39-40.) Claimant described the pain as constantly throbbing throughout the day

5

and that it feels like someone trying to pull the inside of his ear out with a fishhook. (R. 40.) Claimant has inquired about the possibility of surgically correcting the problems, but his doctors feel that the benefits of surgery do not outweigh the significant risks of such a procedure, which include complete paralysis of his face. (R. 42.)

Claimant also testified as to his depression. Claimant stated that his depression was one reason that he failed to pass the psychological evaluation necessary to become a police officer. (R. 42.) Claimant's history of depression predates an incident where his first wife murdered the couple's infant child. (R. 43.) Since the incident, Claimant's depression has worsened, limiting his ability to focus on tasks and hindering his ability to get consistent sleep. (*Id.*) As a result of troubled sleep at night, Claimant regularly sleeps throughout the day. (R. 38, 40.) Claimant struggles with in-person social interactions and sometimes suffers panic attacks in public, which had originally led him to seek employment as a telephonic customer service representative. (R. 43.) Other than for doctor's appointments, Claimant had not left his house in the two to three months preceding the administrative hearing. (R. 44-45.) Further, Claimant testified that he attempted suicide in 2012 when his doctors advised him that discontinuing use of his antidepressant medications may alleviate some of his jaw pain. (R. 44.)

Claimant reported a number of other functional limitations caused by his impairments. Claimant retains a driver's license but has been advised not to drive because of occasional seizures brought about by medications. (R. 37-38.) Claimant is able to make basic meals and take medications without supervision or assistance. (R. 38.) Claimant is also able to use computers and social media websites. (R. 38-39.) He does not grocery shop or attend church. (R. 39.) Claimant does not go out to dinner because his condition requires that he eat exclusively soft foods

6

and most restaurants do not have menu items accommodating his limitation. (*Id*.) Claimant estimates that he sleeps all day, as well as at night. (*Id*.)

## III. Vocational Expert's Testimony

Celena Earl testified as a VE at the administrative hearing. (R. 45-47.) After the VE's testimony regarding Claimant's past work experience (R. 46), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed two hypothetical questions. First, the ALJ posed the following hypothetical:

> [I]f you assume a hypothetical individual who has the same age, education and work experience as the claimant and has the RFC to perform light exertional work. This individual should avoid occupations with hazardous machinery, would be limited to simple routine, repetitive tasks. Should have only occasional contact with coworkers and the general public and only occasional communication by telephone, radio or electronic device with the general public. Could the hypothetical individual that I just describe[d] perform the claimant's past work?

(R. 46.) The VE responded in the negative. (*Id*.) The ALJ then asked whether any jobs existed that such a limited individual could perform. (*Id*.) The VE responded that such jobs did exist and cited the following three examples: small parts assembler (DOT # 706.684-022), electronics worker (DOT # 726.687-010), and mail clerk (DOT # 209.687-026). (R. 46-47.) The ALJ then asked whether jobs were available assuming that such an individual would need to miss four or more work days per month. (R. 47.) The VE responded that no jobs would be available. (*Id*.)

## DISCUSSION

## I. Listings 12.04 and 12.06

Claimant contends that the ALJ's finding that Claimant's impairments neither met nor medically equaled Listings 12.04 and 12.06 is not supported by substantial evidence. (Pl.'s Mem. at 11-15.) In support of his argument, Claimant asserts that the ALJ erred in giving "little weight" to the opinions of Dr. Gratiela Zbarcea, Claimant's treating psychiatrist, and Kristie Cavanaugh, a

7

social worker who was Claimant's psychotherapist, while giving "great weight" to two non-examining state agency consultants. Claimant argues that because his treating providers were not accorded the proper weight, the ALJ's determination that Claimant's impairments did not meet or medically equal Listings 12.04 and 12.06 was not supported by substantial evidence.

Both Listings 12.04 and 12.06 require a showing that several factors have been met as to a claimant's functional limitations or that the claimant has experience repeated episodes of decompensation, each for an extended duration. 20 C.F.R. § 404, subpart P, app. 1, 12.04, 12.06.

An ALJ has a duty to explain the administrative decision so as to enable meaningful judicial review. "While the [Commissioner] is empowered. . . to resolve evidentiary conflicts, the[Commissioner], through the ALJ, is required to explicitly indicate 'the weight given to all relevant evidence.'" *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987) (quoting *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984)). In particular, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). A denial of benefits is not supported by substantial evidence if the ALJ "has [not] analyzed all evidence and . . . sufficiently explained the weight he has given to obviously probative exhibits." *Gordon*, 725 F.2d at 236. "[R]emand is appropriate where an ALJ fails to discuss relevant evidence that weighs against his decision." *Ivey v. Barnhart*, 393 F. Supp. 2d 387, 390 (E.D.N.C. 2005) (citing *Murphy*, 810 F.2d at 438). Furthermore, "the ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986).

An ALJ must consider all the evidence available in the case record. "This includes, but is not limited to, objective medical evidence; other evidence from medical sources, including their

opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other "non-medical sources" and decisions by other governmental and nongovernmental agencies about whether an individual is disabled . . . ." SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006). Medical sources include not only physicians and other licensed practitioners designated as "acceptable medical sources," but also other health care providers who are not "acceptable medical sources," such as licensed clinical social workers. *Id.*

Generally, a treating physician's opinion should be accorded greater weight than the opinion of a non-treating physician's opinion, but the court is not required to give the testimony controlling weight in all circumstances. *Mastro*, 270 F.3d at 178. Rather, a treating physician's opinion on the nature and severity of a claimant's impairment is given controlling weight only if it is "supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on the record." *Id*; *see also* 20 C.F.R. § 404.1527(c)(2). "[B]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (quoting *Craig*, 76 F.3d at 590) (internal quotation marks omitted). Thus, the ALJ has the discretion to give less weight to the treating physician's testimony in the face of contrary evidence. *Id*. "[T]he ALJ is not bound by a treating physician's opinion regarding whether a claimant is disabled, as that opinion is reserved for the Commissioner." *Parker v. Astrue*, 792 F. Supp. 2d 886, 894 (E.D.N.C. 2011) (citing 20 C.F.R. § 404.1527(e)(1)). The Commissioner will use medical sources to provide evidence "on the nature and severity of [a claimant's] impairments," but determination of a claimant's residual functional capacity is a matter reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(2).

9

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must determine the weight to be given the opinion, considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidentiary support for the physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) any specialty or expertise of the treating physician; and (6) any other factors tending to support or contradict the physician's opinion, such as the extent of the physician's understanding of the Social Security disability programs and the physician's familiarity with other information in the record. 20 C.F.R. § 404.1527(c)(2)-(6); *see also Parker*, 792 F. Supp. 2d at 894.

"With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 2329939, at *3. While information from these "other medical sources" cannot be used to establish the existence of a medically determinable impairment, it should be considered in assessing the severity of an impairment or its functional effects. *Id.* ("Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.").

In determining the weight to be accorded "other medical sources," an ALJ should consider the following factors: (1) the length of time the source has known the individual and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides relevant evidence to support her opinion; (4) how well the source

10

explains her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the source's opinion. *Id.* at *4-5. Although "accepted medical sources" are considered the most qualified health care professionals, "an opinion from a medical source who is not an 'acceptable medical source'" may, in certain cases, "outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* at *5. Therefore, it is important that the ALJ not only consider these factors, but also explain "the weight given to opinions from these 'other sources' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. Both Dr. Zbarcea and Ms. Cavanaugh provided treatment for Claimant over a number of years. Neither party disputes that they are "treating sources." Dr. Zbarcea provided a Psychiatric Review Technique ("PRT") assessment dated February 26, 2013, in which he specified that Claimant met Listings 12.02, 12.03, 12.04, and 12.06. (R. 484.) However, he indicates he bases his medical opinion solely on Listings 12.04 and 12.06. (*Id.*) Dr. Zbarcea went on to address each Listing in turn. Specifically, he reported that Claimant met eight of the nine characteristics for depressive syndrome under Listing 12.04, when only four are required to meet the listing.. (R. 487.) Under Listing 12.06 for Anxiety-Related Disorders, Dr. Zbarcea indicated that Claimant met three of the qualifications when only one was required. (R. 489.) Dr. Zbarcea chose to address Claimant's dystonia under Listing 12.07 for Somatoform Disorders, stating that Claimant had an "Oro-Mandibular dystonic reaction." (R. 490.)

The ALJ explained he gave "little weight" to Dr. Zbarcea's opinion because "it purports to list impairments for which there is no diagnosis, such as organic mental disorders and

11

schizophrenia or psychotic disorders" and he "does not point to specific treatment notes or provide any discussion of the paragraph B criteria." (R. 22.)

Ms. Cavanaugh has been Claimant's treating psychotherapist since 2005. She submitted three separate opinion documents which were considered by the ALJ: a PRT questionnaire completed August 23, 2012 (R. 565-77); an RFC form completed October 9, 2012 (R. 420-25); and a second PRT questionnaire completed on February 5, 2013 (R. 454-65). Ms. Cavanaugh, like Dr. Zbarcea, bases her opinion on Listings 12.04 and 12.06. (R. 454, 565.) She also found that Claimant meets eight out of nine characteristics of "depressive syndrome" under Listing 12.04 (R. 457, 568) and meets three qualifying characteristics under 12.06 for Anxiety Related Disorders (R. 459, 570). In her first PRT, Ms. Cavanaugh references Claimant's dystonia under Somatoform disorders (R. 571). Both PRTs indicate Claimant is extremely limited in all three areas of functional limitation (R. 462) and has experienced four or more episodes of decompensation, each of extended duration (*Id.*). On the first PRT, Cavanaugh explains, "In the last year, [Claimant] has decompensated further – develop[ment] of muscle dystonia, we feel, is related to psychiatric impairment – condition and need for [treatment] will likely be long-term." (R. 577.)

In assigning little weight to Ms. Cavanaugh's opinions, the ALJ first noted that "Ms. Cavanaugh is not an acceptable medical source for the establishment of impairments, although she is a treating source with a longitudinal knowledge of the claimant's impairments." (R. 21.) The ALJ also found that Ms. Cavanaugh's findings of four episodes of decompensation and her opinions regarding the paragraph B criteria were not supported by the evidence. The ALJ further concluded that Ms. Cavanaugh's opinions regarding Claimant's ability to return to work were

12

tailored around his past employment and did not sufficiently explore the potential for other work. (R. 21-22.)

In evaluating Listings 12.04 and 12.06, the ALJ found that Claimant experienced mild difficulties in activities of daily living and moderate difficulties in social functioning and concentration, persistence, and pace. (R. 15.) The ALJ further found no repeated episodes of decompensation, history of an inability to function outside of a highly supportive environment, unstable condition where a slight change in demands would cause decompensation, or a complete inability to function outside of the home. (*Id.*) In determining whether Claimant experienced episodes of decompensation, the ALJ only addressed Claimant's hospitalization for suicidal ideations, concluding that the one instance, alone, did not meet the durational or frequency requirements of paragraph B (*Id.*)

The ALJ's evaluation of Dr. Zbarcea's and Ms. Cavanaugh's opinions is insufficient in that it fails to adequately address the extent to which Claimant's dystonia is a symptom of his mental impairments or a side effect of his medication, which may further exacerbate the severity of Claimant's impairments. Both treating sources and other treating physicians indicate throughout the record that Claimant's dystonia is connected to his depression and anxiety – either as a symptom of his impairment or as a side effect of the psychotropic medications prescribed to treat his mental impairments. For example, on April 5, 2012, an emergency room physician indicated his clinical impression that Claimant's jaw displacement was "dystonic drug reaction." (R. 314.) During a visit with Dr. Zbarcea on May 7, 2012, Dr. Zbarcea noted "any antidepressant may cause or worsen his dystonia." (R. 377.) On May 21, 2012, a test of Claimant's jaw muscles indicated there was no "spontaneous activity" causing the dystonia. (R. 318.) On May 22, 2012, Dr. Zbarcea changed Claimant's medication, indicating in his treatment notes that he was switching

13

Claimant to a medication that would "hopefully caus[e] less of the motor side effects."  (R. 376.) Dr. Zbarcea noted that "conversion disorder was not completely out of the question given [Claimant's] history of very significant and unusual trauma."  (R. 376.)  During an appointment on June 12, 2012, Dr. Zbarcea diagnosed Claimant with "Oro-mandibular dystonic reaction," noting that "at times when [he] relaxes and talks about certain subjects [Claimant's] jaw relaxes." (R. 373.)  On July 26, 2012, after determining a tumor was not causing Claimant's dystonia, a physician with UNC Hospitals indicated Claimant's "problems are felt to be related to dystonic dystonia related to psychiatric medications." (R. 387.)  Further, in her RFC assessment, Ms. Cavanaugh indicates that "[a]ll symptoms are worsened by severe dystonic reaction."  (R. 415.)

The ALJ analyzed Claimant's dystonia and his mental impairments as separate impairments.  No discussion or analysis is provided as to how Claimant's dystonia may affect the severity of his mental impairments.  Nor does the ALJ address how Claimant's dystonia may exacerbate the severity of his mental impairments.  This is especially significant given the ALJ finding that Claimant has not experienced any episodes of decompensation of an extended duration.  As explained above, Ms. Cavanaugh opined that Claimant's jaw dystonia is evidence of decompensation and that Claimant had suffered four or more episodes of decompensation of extended duration. Additionally, both state agency consultants indicated that Claimant suffered one or two episodes of decompensation.  In addressing Ms. Cavanaugh's assessment, the ALJ simply found that those findings "are not supported by the evidence."  (R. 21.)

Episodes of decompensation

> may be inferred from medical records showing significant alteration of medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

14

20 C.F.R. § 404, subpart P, app. 1, 12.00.

Dr. Zbarcea's notes show significant changes in medication on multiple occasions. In February 2011, Claimant switched from Cymbalta to Welbutrin to help treat his depression and changed his medication to treat his nightmares. (R. 250-53.) On May 7, 2012, Dr. Zbarcea noted, "The patient was on a combination of Ambien, Celexa, had decreased from 40 to 20 mg q day, Prazosin; Valium, Benadryl when he had his first dystonic reaction." (R. 377.) Dr. Zbarcea went on to explain, "Mr. Rizor was then taken off all psychotropics except Valium, Benadryl, and Ibuprofen to assist with his jaw tension and was seen in 3 days; he actually got worse meanwhile and his psychiatrist referred him to a neurologist." (*Id.*) On May 21, 2012, Dr. Zbarcea decreased Claimant's Zoloft dosage and increased Claimant's dosage of Welbutrin hoping to alleviate Claimant's dystonia. (R. 376.) In June 2012, Dr. Zbarcea added Depakote to Claimant's medication regimen, but that resulted in extreme side effects. (R. 374-75.) Claimant's neurologist prescribed Klonopin for his dystonia and it was noted that Hydrocodone did not work. (R. 373, 375.) On August 8, 2012, Dr. Zbarcea noted that Claimant's neurologist had switched Claimant from Klonopin to Oxycontin because Klonopin was not efficiently taking care of the dystonia. (R. 379.) On November 11, 2012, Dr. Zbarcea prescribed Remeron for increased depression, adjusted Claimant's prescription for Prozac, and considered removing Valium from Claimant's medications because it was not alleviating his dystonia. (R. 435.)

The ALJ provides no explanation for his rejection of Ms. Cavanaugh's assessment that Claimant's dystonia itself is decompensation. Nor does he address the numerous changes in medication that Claimant underwent. Additionally, there is evidence in the record that Claimant was hospitalized once, if not twice, for suicidal ideation. Because the ALJ did not adequately address the interaction of Claimant's dystonia and his mental impairments and did not explain his

15

conclusion that Claimant did not suffer from episodes of decompensation, it cannot be said that the weight given to Dr. Zbarcea's and Cavanaugh's opinions is supported by substantial evidence and based on the proper legal standard. Accordingly, it is recommended that the case be remanded to the Commissioner for further consideration.

## II.     Residual Functional Capacity

Given the undersigned's recommendation that the case be remanded for further consideration of Dr. Zbarcea's and Ms. Cavanaugh's opinions and the possibility that the ALJ's reconsideration may significantly impact the RFC determination, the undersigned expresses no opinion whether the ALJ erred in assessing Plaintiff's RFC.

## **CONCLUSION**

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-22] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-26] be DENIED and the matter be REMANDED to the Commissioner for further consideration.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 31st day of October 2014.

*Kimberly A. Swank*
KIMBERLY A. SWANK
United States Magistrate Judge